THE CENTRAL BANK OF WISCONSIN VS. ST. JOHN and an-
other, Adm'rs.

A bank, in discounting drafts at the highest rate allowed by law, may also charge
the current rate of exchange as a compensation for collecting the drafts, pro-
vided this is not resorted to as a device to evade the statute against usury.

Where such charge was made in good faith, the transaction is not rendered usurious
by the draft being subsequently retained by the bank at the request of the
drawer, and paid by the latter at maturity, without any deduction of the
amount charged for collection.

In an action upon notes which include the amount of such drafts and the charges
made thereon, testimony of the drawer that it was his understanding that the
arrangement for such discount and charges "was made on the part of the bank
for the purpose of obtaining from him a greater amount than legal interest, and
evading the usury law," was properly rejected. The witness could testify only
to the facts, and not to his inferences.

It is no defense to an action against the indorser of a non-negotiable note, that the
note was protested for non-payment, and the defendant notified in the manner
required to charge the indorser of negotiable paper.

Under chapter 248, Laws of 1860, the notarial certificate of protest, &c., is *prima
facie* evidence of the contents of the notices therein stated to have been
served.

Where by statute there is a trial *de novo* in the circuit court upon an appeal from
an order of the county court allowing or disallowing a claim against the estate
of a decedent, such order cannot be read to the jury as evidence of any fact
therein stated.

Where one of the issues presented by he pleadings was, whether notes sued on were
usurious, it was not error to deny the defendants' counsel the privilege of open-
ing and closing the argument, as to that issue. It is not usual thus to divide
the issues; and at all events a mistake in that respect would be no ground for
a new trial, unless injustice were shown to have resulted from it.

APPEAL from the Circuit Court for *Rock* County.

On the 22d of March, 1860, at Janesville, in this state,
Charles Colby made his note for $600, payable to the order of
Levi St. John and G. P. Leonard, at the Central Bank of Wis-
consin (at Janesville), September 1, 1862, with interest at ten
per cent. per annum till paid; the interest to be paid Septem-
ber 1, 1860, and thereafter on the 1st of May and Septem-
ber of each year; with a provision that in case of a failure to
pay any interest for thirty days after it became due, the prin
cipal should become due and payable at the option of the hold-

er. On the same day Colby executed three other notes similar to the one above described, except that they were for $1,000 each, and payable one, two and three years respectively after the day upon which that was to become due. These notes were all indorsed by the payees to the Central Bank of Wisconsin. On the 1st of September, 1860, said Colby, St. John and Leonard made their joint and several note for $159, payable at said bank, to the order of its cashier, on the 1st of May, 1861, with interest at ten per cent.; which was given in payment of interest to the date thereof on three of the above described notes. Afterwards, Levi St. John died, and the defendants in this action, *J. A. St. John* and *J. A. Peckham*, became administrators of his estate. In adjusting claims against the estate, the county judge of Rock county allowed the claim of the bank for the principal of each of said notes, and interest calculated to the date of such allowance. From this decision the administrators appealed to the circuit court, which thereupon, on the 25th of January, 1862, directed a trial by jury of certain questions of fact as to each one of said notes towit: whether it was executed and indorsed as above stated; whether payment of any part which had fallen due was duly demanded, and the note duly protested for non-payment, and due notice thereof given to Leonard and to Levi St. John or his administrators; whether the note was owned and held by the plaintiff; whether the same or any part thereof remained unpaid; and how much was due thereon to the plaintiff. The jury were also directed to find " whether the aforesaid notes, or any of them, are usurious, and whether they, or any of them, were signed or indorsed by said Levi St. John as surety or accommodation indorser for Colby."

On the trial, the plaintiff proved the execution of the notes and the indorsement of the four first mentioned as above stated, and that it was the owner and holder of them all. The notes were read in evidence. On the back of each of the four first was the following: "Rec'd, Nov. 28, 1860, for interest due

JUNE TERM, 1863. 159

The Central Bank of Wisconsin vs. St. John et al., adm'rs.

Sept. 1st last, note of makers and indorsers." Attached to each of said four notes was a notary's certificate of protest for non-payment of interest on the 4th of September, 1861, which stated that notice of protest for Levi St. John was delivered to *Josephus A. St. John,* administrator &c., and that notice to G. P. Leonard was delivered to him in person ; and that each of said notices contained a true description of said note, and an averment that the same had, on that day, been presented for the payment of interest, and that payment of the same had been refused, and the holder looked to the person served with said notice for the payment of the note. Each certificate also stated the amount of interest upon the note to which the same was attached, for which payment had beeen demanded and refused, to wit : on the first note, $20 ; and on each of the other three, $33.33. The defendants, to sustain the issue on their part, offered to read in evidence the return of the probate court, "for the purpose of showing that the Central Bank of Wisconsin had presented these notes to the county judge for allowance against the estate of Levi St. John, and that they were allowed by said judge against said estate for the whole amount of the principal named in them and the interest thereon to the time of such allowance ;" but the court refused to admit the evidence. The defendants then read in evidence the deposition of Charles Colby, which was in substance as follows : "From 1857 to the spring of 1860, inclusive, I lived in Janesville, and carried on a nursery and milling business ; while milling I was in the habit of borrowing money from the Central Bank of Wisconsin, which was first done by their discounting at ten per cent. my notes, which were generally drawn at six days. During the latter part of 1858, or fore part of 1859, J. D. Rexford, cashier of the bank, told me that they could not furnish me money at the same rates they had ; that they were not making money enough out of it ; that they were doing better by me than by their other customers or produce men. He then proposed that I should draw drafts on

my own consignees, and that the bank would cash them and charge me interest and for collection.    I objected on the ground that I wished to control the sale of flour, which I could not do if I made the drafts in that way, because the consignees would insist on selling the flour to meet the drafts.    He then proposed that the bank should retain the drafts and not send them off for collection, and that I should pay interest on them and collection the same as if they had been sent off and collected.    I agreed to the proposition, and he agreed that the drafts should remain in the bank until they became due, when I could draw new drafts to meet them.    In pursuance of that agreement I commenced drawing drafts on my consignees on thirty days' time.    About the 1st of September, 1859, I drew a draft on Allen Howes, of Chicago, for $600, on thirty days, time, on which I paid the bank ten per cent. interest, and one-quarter of one per cent. for collection of the same, at the time when said draft was drawn.    Said draft was not sent to Allen Howes, but was retained in the bank.    I continued to draw drafts on Allen Howes, of Chicago, for different amounts at different times, in pursuance of said agreement; and in all cases paid interest at ten per cent., and the cost of collection at the rate of one-fourth to one-half per cent. on the amount; and in no case, with one or two exceptions (where they were sent by mistake), were said drafts sent to Allen Howes for collection; and when they were sent by mistake, they were returned without being paid and without further cost to me.    The first of these drafts were drawn on thirty days' time, and after about the last of the year 1859, they wanted me to draw them on five or ten days' time, which I refused to do, but finally agreed thereafter to draw them on seventeen days' time, which I did, paying the interest and cost of collection as before.    None of the seventeen day drafts, except a few of those last drawn, were sent to Allen Howes for collection.    Those that were sent were sent in violation of our agreement.    In our whole transactions, J. D. Rexford acted as the agent and cashier of the

bank, and it was my understanding that he made this arrangement on the part of the bank for the purpose of obtaining from me a greater amount than legal interest, and to evade the usury law. The four notes made March 22, 1860, were given by me to the bank for the purpose of taking up such of said drafts as remained unpaid at that date, and certain other notes, which were given by me to take up drafts drawn by me in pursuance of said agreement." Attached to the deposition were twenty-eight exhibits, twenty-one of which were drafts drawn by the witness upon Allen Howes of Chicago, for various sums, and dated at different times, from September 1, 1859, to January 27, 1860, payable "to the order of J. D. Rexford, cash., (acceptance waived.)" Seven of them, drawn between September 1st and December 8th, 1859, were at thirty days; the remainder, which were of later date, were at seventeen days. The other seven exhibits were checks drawn by the witness upon the plaintiff, payable "to discount or bearer," corresponding in their dates with the same number of drafts, and each for an amount larger than the discount upon the draft of the same date; and the witness testified that said checks were for discount upon said drafts and the cost of collection charged upon the same, and that none of said drafts had ever been presented to the drawee for collection. On motion of the plaintiff, and against the defendant's objection, the court struck out of the deposition the words " it was my understanding that he (Rexford) made this arrangement on the part of the bank for the purpose of obtaining from me a greater amount than legal interest, and to evade the usury law." The defendant then read in evidence the deposition of Allen Howes, who testified that during the years 1858, 1859 and 1860, there were one or two drafts, drawn on him by Colby, presented to him either for acceptance or payment, he did not remember which; neither of them was paid, because he had no funds belonging to Colby in his hands; never had the drafts in his possession, and did not know what became of them.

The plaintiff then called J. D. Rexford, cashier of the *Central Bank*, who testified as follows: "There has been paid on the four notes the interest due May 1, 1861. The interest due September 1, 1860, was paid by note. That is all that has been paid. Mr. Colby commenced the milling business about the first of October, 1859. During the summer previous we discounted for him no paper, except to renew an old note he had had in the bank for some time, which was made by him and indorsed by St. John and Leonard, and had no connection with his produce business. It was for between six and eight hundred dollars, and is a part of the consideration of the notes in suit. In August, 1859, Colby came to me and told me he had rented the Bower City Mill, and said he wanted to make an arrangement with us to let him have money to run it. I told him we could do so if he could give satisfactory security; he told me that he could give the names of St. John and Leonard. He wanted to arrange for a limit of $3,000. I laid his proposition before the discount board, and they accepted it. I reported to him, and he brought a written paper signed by St. John and Leonard. Soon after that Colby commenced drawing drafts on Chicago; the paper that he wanted discounted, and that our bank agreed to discount, was drafts on his consignees. I think he drew his first draft about the 1st of September, 1859. It is the first exhibit to his deposition. His mill was not ready, and he expected to start in about two weeks, but did not start so soon. There was no arrangement or agreement, at the time the draft was drawn and discounted, that it should be retained in the bank and paid here, and not sent forward for collection of Howes. Colby continued business in the mill up to February, 1860. There was never any agreement between him and myself that any drafts that the bank might discount for him should be held here for payment in Janesville. All the drafts drawn by him were sent forward for payment, unless, after they were discounted and before they were sent, he requested that they should be held here for pay

ment for his accommodation. All of these drafts did not go forward for collection, because Colby came before they became due, and wished to pay them here. There was no different arrangement or agreement from that already spoken of. The drafts were all drawn ' acceptance waived,' because we had security here, and because if they had not been so drawn it would have been necessary to send them forward for accept-ance at once to hold the drawer; and when so sent, if the con-signee should not have flour on hand with which to pay, he would be likely to refuse to accept, and then the draft would be returned protested; and also because, being unacquainted with the responsibility of the consignee, we would not loan money and look to him, and had taken security here for the payment. The drafts that were sent were sent before maturity. In all cases the drafts were sent on for payment, unless held here at Colby's request. The request was made a little before the maturity of the draft in every case where they were held for payment here. There was never any agreement at the time the drafts were drawn in any case, that they were to be paid here. The reason he gave why he did not wish the first draft sent off was because his mill was not in operation, and he could not get the flour forward to meet it. After the mill was com-pleted, he gave as a reason that the mill did not run well, and he could not get the flour into the hands of his consignee suffi-ciently fast to enable the latter to meet the drafts. Another reason he gave for desiring drafts held here for payment, to-ward the close of the business, was, that he had drawn out of the business $1,000, which he had sent off to his brother to pay an old debt. The old note and the unpaid drafts on the 22d of March, 1860, amounted to $3,600. This was settled by giving the $600 note and the three $1000 notes." The plain-tiff's counsel then read to the witness that portion of Colby's deposition, commencing with the words " during the latter part of 1858," and ending with the words ·· I commenced drawing drafts on my consignees," &c., and asked the witness whether

the same was true or false. The witness answered " that it was false ; that he never had any such conversation with Colby, or made with him any such arrangement or agreement as is therein stated ; and that every part of said deposition relating to an agreement to discount drafts and hold them in the bank for payment, and not send them forward for collection, was untrue."

The counsel for the defendant insisted that he had a right to open and close the case to the jury on the question of usury, but the court decided that the plaintiff was entitled to open and close. The court, among other things, instructed the jury as follows : " If you find that when the drafts for which the notes were given were discounted, there was no agreement with the bank that they should be held at Janesville for payment, the fact that they were so held instead of being sent forward for payment to Chicago, would not make them usurious, even though they were paid at Janesville." The defendant asked the following instructions, which were refused : 1. " If you are satisfied from the evidence that the plaintiff discounted the drafts of Colby upon Allen Howes of Chicago, and received from Colby ten per cent. as interest, and one-fourth of one per cent. for the collection of the drafts from said Howes, and that said collection was not made, and that the notes read in evidence were given for the unpaid balance of such drafts without allowing Colby credit for this one fourth of one per cent., then these notes are usurious." 2. " The notarial certificate of protest, read in evidence, is not alone sufficient to charge the indorsers, and there being no other evidence of notice to the defendants, of demand of payment and of non-payment of interest claimed in this case, the testimony is not sufficient to warrant a verdict in favor of the bank." The jury found that the several notes described in the issues submitted to them were executed to the plaintiff as above stated ; that they were owned by the plaintiff ; that the four notes dated March 22, 1860, " were duly protested for non-payment, after due demand

of payment made, and due notice of such non-payment and protest was given to the administrators of said Levi St. John, and no part of any of said notes has ever been paid;" they also found that there was due on the note of September 1, 1860, $177.92; and that on the 25th of January, 1862, there was due on the other four notes for interest up to September 1, 1861, certain specified sums, amounting in the aggregate to $120. They also found that none of the notes were usurious, and that they were all signed or indorsed by Levi St. John as surety or accommodation indorser for Colby. The court rendered a judgment similar in form to the verdict, and adjudging that the plaintiff recover from the defendants the sum of $297.92, so found due, with costs.

*Knowlton & Jackson,* for appellants, contended, first, that the notes in suit were not negotiable paper, and therefore Levi St. John could not be held as indorser: Second, that the notes were usurious. On the second point they cited *Bank of Utica vs Wager,* 2 Cow., 712, and argued that no service was rendered for Colby by the bank, and it therefore wittingly and intentionally took from him for *the use* of its money more than the law allows. It makes no difference that the lender in such a case *does not think* that he is acting contrary to law; it is enough that he knowingly takes for the use of his money a greater amount than the law in fact allows. 2 Cow., *ubi supra,;* 9 id., 225; *Thompson vs Nesbit,* 2 Richardson (S. C.,) 73; *Marsh v. Martindale,* 3 Bos. & Pul., 154, *Roberts v. Trenayne,* Cro. Jac., 507; 1 Esp., 11; 2 Campb., 375; 5 Rand., 132; 2 Peters, 537; 1 Root, 110; Har. & Johns., 477; 19 Johns., 294; 7 Leigh, 26; 1 Denio, 133. Counsel also insisted that it was clear from the evidence that the bank discounted the drafts and charged for collecting them without any intention or expectation of actually sending them off for collection.

*Conger & Hawes,* for respondent.

*By the Court,* DIXON, C. J. No ground of objection to the

certificates of the notary was specified. If it was that they were not evidence of the contents of the notices served, it was obviated by chap. 248, Laws of 1860, which declares that they shall be *prima facie* evidence.

It was a trial *de novo* in the circuit court, and the order of the county court was wholly immaterial. It was properly rejected as an item of evidence to be considered by the jury.

It was right to strike out the statement of the witness Colby as to his understanding of the purpose for which the drafts were drawn. His understanding or inferences were not evidence. The question was as to the facts of the transaction, and it was only to them that the witness was competent to speak. · ·

There was no error in permitting the plaintiff to open and close the argument to the jury. It is not usual to divide the issues and allow them to be argued piecemeal. At all events a mistake in this respect is no cause for a new trial, unless injustice is shown to have resulted from it.

Nor was there any error in giving or refusing instructions to the jury. It was lawful for the plaintiff, in addition to the rate of interest prescribed by law, to bargain for and receive the usual current rate of exchange as compensation for collecting the drafts, provided it was not resorted to as a device to avoid the statute against usury. Laws of 1852, chap. 479, sec. 43; Laws of 1858, chap. 98, sec. 1. *Prima facie*, therefore, the drafts were valid, and the device, if it existed, was a question of fact for the jury. There was nothing for the court to determine as matter of law in relation to the existence of the usury, farther than to instruct the jury, as was very accurately and properly done. If the drafts were usurious, they must have been so from the first; and whether they were or not depended upon the intention of the parties at the time they were drawn. If drawn in good faith, to be paid in Chicago, they were valid, no matter where they were paid; but if the intention then was that they should be paid in Janesville, they were

void. The jury believed the witness Rexford, in opposition to Colby, and it is not for us to disturb their verdict.

Whether the notes are negotiable or non-negotiable is an immaterial question. The liability of the defendants is the same in either case.

Judgment affirmed.